UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:21cr31 (JCH) |
| | : | |
| v. | : | |
| | : | |
| DONNA MONTICONE | : | May 18, 2021 |

### GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

The essence of this case is that the defendant, a nurse, purposefully emptied vials containing an anesthetic and refilled them with a saline solution knowing that they would be administered to surgical patients. Both the significant physiological consequences of her actions and the professional breach of trust inherent in her crime are described in stark detail in the victims' letters to the Court. The defendant should be sentenced to a term of incarceration within the Guideline range.

### Relevant Procedural History

On March 2, 2021, the defendant pleaded guilty to tampering with a consumer product. In the plea agreement, the parties agreed that the defendant's base offense level under U.S.S.G. § 2B1.1 is 25. Two levels are added under § 3B1.3 because she abused a position of trust in a manner that significantly facilitated the commission of the offense. After subtracting three levels under

1

U.S.S.G. § 3E1.1 for acceptance of responsibility, the total offense level is 24.[1]   PSR ¶ 24.

A total offense level 24, with a Criminal History Category I, results in a range of 51 to 63 months of imprisonment (sentencing table) and a fine range of $20,000 to $200,000.   The probation officer concurred with this application of the Sentencing Guidelines.   *See* PSR ¶¶ 98, 106.

After reviewing the Presentence Report, the government believes that there are no disputed issues of material fact or law in this case.   The Court must determine what is a fair and just sentence under 18 U.S.C. § 3553(a).   For the reasons stated below, the government believes a sentence of incarceration within the applicable Guideline range is warranted.

Sentencing is scheduled for May 25, 2021 at 10:00 am.

## Restitution

The Court should enter an order of restitution for $637.56, payable to the crime victims fund   It does not appear that the defendant made any restitution payments prior to sentencing.

## Offense Conduct

Donna Monticone was a nurse employed by the Yale Reproductive Endocrinology and Infertility clinic (hereinafter Yale REI) from February 29, 2016

---

[1] At sentencing, because the defendant has assisted authorities by timely notifying the Government of her intention to plead guilty, the Government intends to make an oral motion that the Court award the third point for acceptance of responsibility under U.S.S.G. § 3E1.1(b).

through December 1, 2020. The clinic was initially located at a facility in the Long Wharf section of New Haven, Connecticut. In February 2020, the clinic relocated to Orange, Connecticut (referred to as the Orange West Campus). However, due to the Covid-19 pandemic, initially few procedures were conducted in Orange. On March 31, 2020, the defendant completed an application to serve as the alternate coordinator for the DEA Controlled Substances Ordering System at the Orange facility. In June 2020, regular operations for elective fertility procedures resumed at the Orange West Campus.

Fentanyl is a member of a cohort of drugs used by the Yale REI medical staff during invasive outpatient surgical operations, such as egg retrieval procedures. Fentanyl is one of the agents used in a multi-drug approach to aid in the reduction of pain.[2] When the clinic was located in Long Wharf, controlled substances were typically ordered from a pharmacy immediately prior to a scheduled procedure. After moving to the Orange facility, Yale REI stopped ordering controlled substances, including fentanyl, from pharmacies. In April 2020, Yale REI began ordering controlled substances in bulk for procedures. Thereafter, rather than obtaining the controlled substances on an as needed basis, these products, including fentanyl, were pre-ordered, and were now stored on site.

---

[2] It appears as if Yale REI used two different types of procedures. Initially, a conscious sedation procedure was employed that did not require the presence of an anesthesiologist with a M.D. Starting in April, 2020, Yale REI started to use a different procedure that required the presence of an anesthesiologist to administer the cohort of anesthetic compounds. Apparently, this procedure was only offered on weekdays until October 10, 2020 when it began to be offered for weekend procedures. Fentanyl can be used in both procedures.

Starting on or about March 31, 2020, Ms. Monticone had the new responsibility of ordering and inventorying a variety of narcotics used by Yale REI, including fentanyl.

Starting in June 2020, Monticone began stealing fentanyl for her own use. As a manager of the controlled substances used by Yale REI, she accessed the secure storage areas and took vials of fentanyl to be used to help anesthetize patients. She used a syringe to withdraw the narcotics from the vials and reinjected saline into the vials so that it would appear as if none of the narcotics were missing. The room where the fentanyl was stored was not always locked and Ms. Monticone was able to access it at times without swiping her card. Approximately 75% of all the fentanyl given to patients at Yale REI from June 2020 to October 2020 was adulterated with saline. Some of these vials likely contained diluted fentanyl, while others had no drug at all and contained just saline.

During the course of this investigation, the FDA analyzed three vials of fentanyl found in the Yale REI storage facility by both liquid chromatography with mass spectral detection (LC-MS) and by high performance liquid chromatography with ultraviolet detection (HPLC-UV). All of these vials contained one or more needle punctures.[3] Further, all of the vials contained only trace amounts of fentanyl (less than 3% of the intended concentration).

---

[3] The FDA agent reports that fentanyl is stored in single use vials that should not have any puncture marks in the septa. The single use vials are disposed after a patient dose is prepared. Because the vials are disposed of after formulation, the potential victims in this the case have been identified as those who had procedures at Yale REI involving fentanyl during the relevant time period.

| Vial | Min. Number of Punctures Observed | Fentanyl concentration (µg/mL) | % of Declared Concentration |
|---|---|---|---|
| 1 | 1 or 2 | Trace (less than 1.27) | Less than 3% |
| 2 | 2 | Trace (less than 1.27) | Less than 3% |
| 3 | 3 | Trace (less than 1.27) | Less than 3% |

The defendant knew that the adulterated vials of fentanyl she replaced in storage at Yale REI would be used in surgical procedures and that the absence of an anesthetic during an outpatient procedure may cause serious bodily injury to the patient.

The defendant initially injected herself with the fentanyl in the restroom while working at Yale REI. She eventually began taking the vials home. She would refill the vials with sterile saline at home, bring them back into work at Yale REI, and reintroduce them into the stock of fentanyl available for use during surgical procedures.

On October 30, 2020, one of the defendant's co-workers noticed a loose cap on a bottle of fentanyl and initiated an inquiry.

On or about November 1, 2020, the defendant brought approximately 175 vials of fentanyl that she had taken from Yale REI back from her house and disposed of the vials in waste containers at Yale REI.

On November 2, 2020, Yale REI began an audit of its controlled substances

stored on site.

On November 4, 2020, Yale REI was inspected by the Connecticut Department of Consumer Protection and the DEA. The defendant was interviewed by agents and denied taking any fentanyl.

On November 17, 2020, after testing positive for fentanyl, the defendant met with agents for a second time and admitted that she had been taking fentanyl, explaining that she was experiencing stress related to her divorce. She indicated that after the crime was discovered, she simply stopped taking the narcotic and did not suffer any withdrawal symptoms.

## Analysis of the § 3553(a) Factors

Section 3553(a) directs the district court to consider a number of factors in imposing a fair and just sentence. Each criminal case is different and emphasizes different combinations of § 3553(a) factors. In this matter, the government believes the most important § 3553(a) factors are the (1) the specific nature and circumstances of the offense, (2) just punishment and (3) general deterrence.

## The Nature and Circumstances of the Offense

There is no question the defendant's crime constitutes a serious offense. She was a nurse who took pain medications that were intended for patients undergoing a painful surgical procedure. The adulterated vials were made available for use during these surgeries. These facts speak for themselves and, standing alone, warrant a significant sentence of incarceration.

At sentencing, the government expects that patients who were impacted by the

defendant's crime will make statements to the Court. Numerous letters have been submitted to the Court that describe both the physical pain experienced by these victims and the impact of this crime on both their personal and family lives. These statements speak for themselves.

There is no doubt that this Court should consider the defendant's personal circumstances involving her divorce in fashioning a just and proper sentence under § 3553(a). But this is not a justification for replacing an anesthetic with inert saline solution to the detriment of surgical patients. It simply cannot be used to rationalize the pain and suffering she knowingly inflicted on the victims who were essentially helpless to know what was happening. The nature of the crime itself warrants a period of incarceration

## Just Punishment

A sentence of incarceration within the applicable Guideline range would be in accord with other sentences imposed on other defendants for similar crimes. In *United States v. Carl Mancini*, 3:39cr310(MPS), the defendant was employed as a pharmacist by a company that prepared intravenous infusions for home or hospice care for pain management of terminally ill patients. Over a period of several months, Mancini repeatedly took vials of hydromorphone hydrochloride and morphine sulfate pentahydrate that were intended to be used to formulate infusions for patients. He used a syringe to withdraw the narcotics from the vials and reinjected saline into the vial so that it would appear as if none of the narcotics were missing. He replaced the vials in the supply area where they were available

for use by patients. Mancini had been addicted to painkillers for years prior to this crime.

This case presents remarkedly similar facts to the case at bar. Both defendants were health care professionals. Both had access to controlled substances as part of their job. Both took controlled substances for their personal use. Both were responsible for patients who required relief from pain. Both refilled the empty vials with saline. Both replaced the vials in a storage facility at their workplace where they knew they would be accessed for patients. Both took steps to hide their actions by making the vials appear to be unadulterated.[4] Both crimes were discovered when a colleague found a vial that appeared to be compromised. Both initially denied their crime and then subsequently admitted their conduct. Both pleaded guilty. Both had the same sentencing range suggested by the Sentencing Guidelines (51-63 months). Both victimized individuals who experienced significant pain. Unlike Mr. Mancini, a pharmacist who did not appear to know or have contact with the patients, it appears that Ms. Monticone interacted with many of the patients who received the adulterated drugs. Mancini was sentenced to a term of incarceration of 51 months.

Further, another product tampering case in New England had a comparable outcome. In *United Sates v. Perrin*, 19 cr-10088(MLW)(District of Mass.), the

---

[4] Mancini took additional steps to avoid detection, such as the use of vial crimpers. Monticone indicated that she resealed the vials with the original adhesive to avoid detection and never took off the crimped top. She inserted the syringe into the side of the septum to avoid detection.

defendant was an LPN who was addicted to drugs. That defendant tampered with morphine bottles, removed the narcotic, and replaced it with cough syrup. These bottles, which were subsequently administered to patients, were found to have between 3.9% and 29% of the active drug remaining. Government's Sentencing Memo in *Perrin* at 2. The defendant was sentenced to a 54-month term of incarceration. Thus, in light of these cases that have similar facts, a sentence the applicable range in this case would avoid unwarranted sentence disparity.

## General Deterrence

Trust between a patient and her healthcare provider is essential to the practice of medicine. While the defendant attempts to argue that her conduct was "aberrational," the plain facts show that it was anything but that. Def's Brief at 1. The duration of the scheme shows that the defendant's criminal conduct was neither isolated, impulsive, nor a one-time lapse of judgment. It required continuity of criminal purpose for months. During this period of time, she could have stopped and sought help. But she didn't. She didn't stop until she was caught. And she denied her crime for over two weeks until after she tested positive for fentanyl.

The act of a patient accepting and taking a medication from a healthcare professional is – at its essence – an act of faith. Patients have to trust that the medicines they are given are indeed authentic and efficacious. It is not uncommon for a variety of different medical professionals to have access to controlled substances. And as is evidenced by the facts of this case, it appears to be all too

easy for those medicines to be adulterated.   One safeguard against this crime is to generally deter other providers who may also face difficult personal circumstances from making the same choice as the defendant.   Other licensed providers facing similar personal challenges should know that if they use their specialized access to deprive patients of needed narcotics, they will go to prison for a substantial period of time.   Such a message would serve both to deter other medical professionals as well as protect their patients.

## Conclusion

After considering the Sentencing Guidelines and the other sentencing factors under 18 U.S.C. § 3553(a), the Court should a sentence the defendant to a term of incarceration within the applicable Guideline range.


Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

/s

RAY MILLER
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT 20451
157 CHURCH STREET, 23RD FLOOR
NEW HAVEN, CT 06510
(203) 821-3700

CERTIFICATE OF SERVICE

This is to certify that on May 18, 2021 a copy of the foregoing Memorandum was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Courts CM/ECF System.

/s

Ray Miller
Assistant U.S. Attorney